IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MORRISON C. ENGLAND, JUDGE

---o0o---

INTEL CORPORATION,

        Plaintiff,

Vs.                                    CASE NO. 2:18-CV-3061 MCE

DOYLE RIVERS, an individual,
and DOES 1 through 10,
inclusive,

        Defendants.

_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RE:  MOTION FOR PRELIMINARY INJUNCTION

THURSDAY, FEBRUARY 7, 2019, 11:00 A.M.

---o0o---

APPEARANCES:

 For the Plaintiff:        MUNGER, TOLLES & OLSON LLP
                           560 Mission Street, 27th Floor
                           San Francisco, California  94105
                           BY:  CAROLYN LUEDTKE,
                                Attorney At Law

For the Defendant:        ALTO LITIGATION, PC
                          4 Embarcadero Center, Suite 1400
                          San Francisco, California  94111
                          BY:  DANIEL SAKAGUCHI,
                               Attorney At Law

*Reported by:  CATHERINE E.F. BODENE, CSR #6926, RPR*

*Official Court Reporter USDC, 916-446-6360*

*501 I Street, Room 4-200*

*Sacramento, California  95814*

*TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION*

1    SACRAMENTO, CALIFORNIA, THURSDAY, FEBRUARY 7TH, 2019, 11:00 A.M.

2                            ---o0o---

3              THE CLERK:  All rise.  Court is now in session.

4              The Honorable Morrison C. England, Jr., presiding.

5              Thank you.  You may be seated.

6              Calling Civil Case 18-3061, Intel Corporation v. Doyle

7    Rivers.  On for plaintiff's motion for preliminary

8    injunction.

9              THE COURT:  Good morning.  Appearances, please.

10             MS. LUEDTKE:  Good morning, Your Honor.  Carolyn

11   Luedtke from Munger, Tolles and Olson on behalf of Intel

12   Corporation.  With me is Sarretta McDonough, in-house counsel

13   at Intel.

14             THE COURT:  Thank you.

15             MR. SAKAGUCHI:  Good morning, Your Honor.  Daniel

16   Sakaguchi from Alto Litigation on behalf of Defendant Doyle

17   Rivers.

18             THE COURT:  Thank you.

19             This matter is on for a motion for a preliminary

20   injunction.  The court's reviewed the papers that have been

21   filed in this case.  And would you like to make any opening

22   statement -- or short opening statement as to what you're here

23   requesting at this point?

24             MS. LUEDTKE:  Sure, Your Honor.  Would you like me to

25   speak from the podium or from the --

1          THE COURT:  The podium, please.

2          MS. LUEDTKE:  So Your Honor, Intel has filed this

3    motion for preliminary injunction seeking what we think is a

4    very narrowly focused injunction asking Your Honor to do two

5    things with respect to Defendant Doyle Rivers.

6          So Doyle Rivers was an employee at Intel, until

7    recently, working on two technologies, 3D XPoint, which is a

8    new memory technology that it was developing jointly with

9    Micron, and Optane, which is a product that incorporates 3D

10   XPoint, which is proprietary and exclusively an Intel product.

11         He has now left Intel, and Intel is concerned that its

12   forensic investigation it did after he left reveals that he has

13   taken Intel confidential and proprietary information related to

14   3D XPoint and Optane.

15         What Intel is asking Your Honor to do today is to

16   issue an injunction, a narrowly focused injunction, with two

17   parts.

18         Part A is an order telling Mr. Rivers that he cannot

19   retain, use or disclose any proprietary or confidential Intel

20   documents that he got from Intel's servers in his work going

21   forward.

22         So we're not talking about things in the public

23   domain, we're not talking about things that he can get from

24   Micron, we are talking about things that came from Intel's

25   server.  That's Part 1.

1          Part 2 is we're asking for an order from Your Honor

2     that he return to us any Intel confidential or proprietary

3     documents that he's taken.

4          And we believe that he has this information because

5     the forensics investigation that was done right before he

6     resigned from Intel shows that he plugged in a USB device,

7     which is one of those removable storage devices you can plug in

8     your computer, a few days before he resigned.

9          And within six minutes of first plugging in that

10    device, he tried to transfer a very highly top-secret document,

11    and that one was blocked.

12         Now, we don't know what else he transferred because

13    the forensics are not able to show the full scope of transfer,

14    but they do show that other folders have metadata that changed.

15    So other folders were accessed, and our forensics expert says

16    that's an indicia of things being transferred.

17         And then five days later, the night before he

18    resigned, late at night, from 10:40 to 11:40, he plugged that

19    device in again, and there is evidence that he transferred more

20    files.

21         We sent him a letter as soon as we found out about

22    this.  Miss McDonough sent him a letter and said that we're

23    concerned, we're concerned that it looks like you transferred

24    documents on your way out the door.  Please, don't destroy

25    anything on that USB device and give it back.

1       Now, if this had been an accident, if it had been

2  inadvertent, one would think he would have just given it back

3  and said sorry.  Instead, he avoided things.  Then ultimately,

4  after we went to his new employer's counsel, he gave it back,

5  but it had been wiped.  He had destroyed all of the evidence on

6  that USB drive.

7       We now know he plugged the USB drive into his home

8  computer, but he won't let us see what's on his home computer.

9  So this is activity that gives us great concern that things

10  have been taken, and we don't know where they are now.

11      THE COURT:  One thing, when you're looking for an

12  injunction saying that there will be irreparable harm, there is

13  generally very concrete evidence of something that will be the

14  harm.  And in this particular case -- I'll get to the other

15  side of this in just a moment -- you are not able to say at

16  this time what it is, if anything, that has been taken and that

17  might cause Intel harm.

18      MS. LUEDTKE:  We know that the compilation of employee

19  information was taken.  We know that was taken.  We can see

20  that in the forensics evidence.  That is a compilation of more

21  than 3,000 employees' information.  Not just their names.

22      They've tried to say this is all things you can find

23  out from LinkedIn.  That is not true.  It was information about

24  their level within the organization, so that would allow you to

25  figure out their compensation level, their personal cell

1    phones, their emails, the time period of their employment.

2    More than 3,000 employees --

3              THE COURT:  So how would that harm Intel?

4              MS. LUEDTKE:  Because as the declaration from

5    Mr. Pangal says, many of these employees have highly

6    specialized expertise in 3D XPoint or Optane and are hard to

7    identify.

8              If someone has this group of information, they could

9    put together a team.  They could try to go in and find the

10   people who have this very highly specialized area of

11   information, and --

12             THE COURT:  So then you would be working on the fact

13   that those people that were involved with this particular

14   project, that would be the 3D XPoint, would then be subject

15   to -- I don't know what the word is I'm looking for -- being

16   attracted by Micron, for example, to try to bring them over or

17   to use their technology in some way?

18             MS. LUEDTKE:  Right.  Micron or another company.

19             THE COURT:  Isn't that speculative?

20             MS. LUEDTKE:  I don't think it is, Your Honor.  We

21   have an individual here who engaged in highly suspicious

22   behavior and then destroyed evidence to cover it up.  So I

23   think there is enough indicia of concern there that if you look

24   at the case law of threatened misappropriation, we have actions

25   that were improper.  He violated his confidentiality agreement

1    by taking this stuff.  That's --

2         THE COURT:  The question this court has is that one of

3    the things that this court is very loath to do is to issue

4    orders that can't be enforced.  So I think it was in one of the

5    papers that it was said that this will be an injunction to obey

6    the law.

7         MS. LUEDTKE:  Well --

8         THE COURT:  I mean, how do you impose an injunction on

9    an individual that says abide by the terms of your contract and

10   obey the law?

11        Why would the court need to issue such an injunction?

12        MS. LUEDTKE:  Well, the court can issue an

13   injunction --

14        THE COURT:  What basis?  What would it be?

15        What's the irreparable harm that would be coming to

16   Intel at this point?

17        MS. LUEDTKE:  Well, the irreparable harm is that we

18   are at risk of our confidential and proprietary information

19   being out there, outside our control, which is a harm because

20   it can be used and disseminated to other people, where we can't

21   control that, highly top-secret technical information and

22   information about a product that the public does not know.

23        Here we have an individual who we have no indicia from

24   him that he doesn't have the information.  He gave you no

25   declaration that says I don't have anything.

1          We have nothing -- they say they have hired a

2     forensics firm who has preserved the evidence, but they

3     haven't -- the forensics firm hasn't put in a declaration

4     saying there is no evidence on his computer.

5          So we have very suspicious behavior.  One would think

6     that you would have before Your Honor a declaration from

7     Mr. Rivers that says:  I didn't take anything.  Or:  I took

8     things, and I deleted it because it was an accident.  Or

9     whatever he's going to say.

10          He doesn't say that.  He doesn't say:  I don't have

11     any of Intel's confidential and proprietary documents.  He

12     doesn't say:  I don't know what they are talking about.

13          He knows what we're talking about.  It is things that

14     relate to 3D XPoint and Optane that came from Intel's servers

15     and from his Intel laptop.

16          That's a specific defined category of information.  It

17     is not the case that we're just saying -- the court would just

18     be saying follow your contract or don't violate trade secret

19     law.

20          Here we have specific evidence that there's been a

21     threat of misappropriation.  And Your Honor would be saying,

22     based on that evidence and based on the declarations, that

23     evidence is valuable and poses a harm to Intel if it is out

24     there in the world, you're issuing a preliminary injunction

25     that says for the pendency of this litigation don't use or

1  disclose Intel's trade secret information about 3D XPoint and

2  Optane that came from Intel's servers and give it back.

3         That is not a don't-break-the-law injunction that is

4  separate from actual facts.

5         THE COURT:  What is your irreparable harm potentially

6  to Intel?

7         MS. LUEDTKE:  That this information will be used by a

8  competitor or sold to a potential competitor.

9         THE COURT:  Monetarily.

10         MS. LUEDTKE:  That's actually the challenge.  It is

11  difficult to quantify the monetary harm.  Let's say the

12  information about Optane, which is a proprietary product that

13  no one in the world knows how to make but Intel, gets out to

14  competitors.

15         The competitor starts making a product that competes

16  with Optane, and that either hurts Optane's sales or unjustly

17  enriches them.

18         It is going to be hard to quantify that.  Right now we

19  could stop it and prevent a new competitor from entering by

20  taking a shortcut and using that information.

21         THE COURT:  But you must have some ballpark?

22         MS. LUEDTKE:  It's a massive nascent business, a

23  brand-new business that is growing.  So I think -- I don't have

24  before you any evidence of what the ballpark is.  But they've

25  invested more than a billion dollars developing the

1  technology.

2  THE COURT:  Thank you.  I understand that in these

3  types of new technology advances it is hard to say which way it

4  is going to go.  Something you may think is fabulous, may just

5  tank.  But what you think may tank, may be huge.  So it is hard

6  to quantify what the actual end result is.  But I think that

7  something that is quantifiable is the amount that's been put

8  into the program by the company.

9  MS. LUEDTKE:  More than a billion dollars has been

10  invested in 3D XPoint.  So Intel certainly hopes it is going to

11  be a blockbuster product that is going to be very successful in

12  the marketplace.

13  THE COURT:  Which would indicate if a company puts in

14  a billion dollars, they are expecting it to be worth at least a

15  billion dollars.

16  MS. LUEDTKE:  One would hope it would be profitable

17  and be worth at least that, if not more.

18  THE COURT:  To get their money back.  If not

19  profitable, to at least get a billion dollars off this program

20  would be quite significant.

21  MS. LUEDTKE:  Yes.  Yes, Your Honor.

22  THE COURT:  All right.  Thank you.

23  Counsel?

24  MR. SAKAGUCHI:  Thank you, Your Honor.

25  There are several reasons why the injunction should

1  not issue.  First, as this court notes, do-no-harm or

2  obey-the-law injunctions are disfavored as in the Swift case

3  out of the U.S. Supreme Court and the FTC case out of the Ninth

4  Circuit.

5       The Winter case requires a clear showing that the

6  plaintiff is entitled to the relief that they seek.  And in

7  this instance, I would liken the proof that they put forward to

8  an optical illusion of sorts.

9       They've talked about items that they know Mr. Rivers

10  took and that he admitted he took.  Those include the

11  spreadsheets with employee names on them and his Perl Scripts,

12  but their forensic trail does not include anything else.  So

13  Mr. Rivers has not responded to purported evidence that

14  Mr. Hanada's declaration --

15       THE COURT:  Okay.  Counsel, wait.

16       Why did your client take a thumb drive and download

17  this information?

18       MR. SAKAGUCHI:  So --

19       THE COURT:  If you tell me because he wanted to send

20  goodbye letters or emails to people, that's ridiculous.  Okay.

21  I mean, the court is not stupid here.

22       If you work at Intel, and you're the vice president,

23  you have been at Micron, you go back to Micron, you know the

24  intensity of intellectual property.

25       For example, you and I know that Apple has an Apple 11

1    iPhone, maybe a 12 in production right now, and no one knows

2    about it, has no idea what's going to happen.

3           Intel has other projects that are going on, and no one

4    knows about it.

5           And so it is imperative that the people who work there

6    not disseminate or take that information from the company.

7    It's imperative; is that not correct?

8           MR. SAKAGUCHI:  That is correct, Your Honor.

9           THE COURT:  So a person who obviously knows that

10   they're going to leave the company of Intel, and go to work for

11   a prior company, who is also a competitor, and then puts in a

12   thumb drive and attempts a week before he is leaving to

13   download a top-secret file, which was blocked because of

14   Intel's security, then the night before, from 10:40 to 11:40

15   downloads personnel records of over 3,000 employees, the first

16   question is why?  And then when the response is, "I wanted to

17   send good-bye emails," that strains my ability to comprehend

18   that argument.

19          This reminded me -- I've been reviewing this case for

20   days.  This reminded me of the case that I had in 2009 where a

21   person -- a woman sued because she discovered that there were

22   no fruit in Froot Loops and there were no berries in Crunch

23   Berries, even though fruit was spelled F-r-o-o-t, and the

24   berries that are presented, as I said in the opinion, were of a

25   color that has never been known naturally in the history of the

1    world.

2          And in order for the court to follow her line of

3    thinking, the court would basically have to lose its mind and

4    go into something that was just ridiculous and lose all common

5    sense, is what the words were.

6          For me to listen to you and say your client downloaded

7    over 3,000 personnel records and other documents so he could

8    write good-bye emails, he wants to make my head explode.

9          And to say that, and then to take that thumb drive,

10   after it has been requested for him to give it back, which it

11   came from Intel, and then say no or don't respond, give it to

12   an attorney for your new employer, and then that employer gives

13   it to a third person, a forensic examiner, and they get the

14   thumb drive back and it's been erased, why?

15         What in the world was he thinking?

16         I don't understand this.

17         I don't know if this rises to a level of injunction,

18   but your client has got -- there is an issue here.  I want to

19   hear you explain to me why your client downloaded information,

20   proprietary information from an employer that he knew he was

21   going to leave the next day.  Because I don't believe that a

22   person learns they're going to take a new job at a company at

23   this level of technology in 24 hours.

24         So there must have been some thought process and some

25   interviews that went up to that point, and then downloads and

1    the next day gives notice and takes it, and then when Intel

2    finds out and says give it back, and no contact, no nothing,

3    and when they get it back, it is erased, what does that look

4    like?

5            MR. SAKAGUCHI:  Understandably, it looks --

6            THE COURT:  Terrible.

7            MR. SAKAGUCHI:  Yes, Your Honor.  But that is -- that

8    is --

9            THE COURT:  I want you to try and explain to me why it

10   doesn't?

11           I'm giving you the opportunity, Counsel, to tell me

12   why it doesn't look like your client stole proprietary

13   information from Intel.

14           Tell me.

15           MR. SAKAGUCHI:  Thank you, Your Honor.

16           Mr. Rivers has been a manager at Intel for going on a

17   decade.  He knows who he works with.  He knows who is good at

18   their job and who is not.  And he knows -- he knows quite a bit

19   of information, admittedly, that would be considered trade

20   secret information, Optane-related information.

21           He does not need a spreadsheet to know who is good,

22   who are the best at their job.

23           THE COURT:  Why did he download 3,000 people's

24   personnel information?

25           MR. SAKAGUCHI:  Understood, Your Honor.

1          THE COURT:  I mean, again, if he had taken maybe five

2   or ten people that were his good friends, that may mean

3   something.  But to take 3,000 names of personnel from Intel and

4   download it and think that was somehow appropriate, a man who

5   has been a vice president for Micron and Intel and has been in

6   this industry for so long, and he thinks that it is okay to

7   take that much proprietary personnel information from a company

8   and then use the most lame excuses, that I wanted to write some

9   good-bye emails, is -- again, my head is going to explode if I

10  hear that.

11         I wish he were here, because I would want to hear him

12  say that.

13         MR. SAKAGUCHI:  That's what he would say, Your

14  Honor.

15         THE COURT:  Then thank God or you better hope it is

16  not a bench trial.

17         MR. SAKAGUCHI:  Understood, Your Honor.  But if I --

18         THE COURT:  I'm only here dealing with the injunction

19  right now.  I'm just telling you where I'm going with this the

20  other way because it makes no sense, at all.

21         And I'm trying to figure out what is the standard that

22  this court has to use to determine whether or not an injunction

23  should issue today against your client.  Because what he's

24  done, as you just said, he's going to say that, so we don't

25  need to talk about it.

1       So tell me why an injunction shouldn't issue for him

2   with that information since he erased it or someone erased it

3   while it was in his custody.

4       MR. SAKAGUCHI:  If I may go back to what he did to

5   prepare.  There were a list of 3,000, and there was another

6   spreadsheet of his team.  He put together an aggregate

7   spreadsheet and put he check marks next to 178 names, from what

8   I understand, and sent an email.  And that email did go out on

9   September 10th.  He did prepare for this prior to September

10  9th.  He had those on his computer and was preparing the

11  spreadsheet over the course of about a week.

12      THE COURT:  Why doesn't he turn his computer over?

13      MR. SAKAGUCHI:  I'm sorry?

14      THE COURT:  Why doesn't he turn his computer over and

15  let it be examined?

16      MR. SAKAGUCHI:  His own computer?

17      THE COURT:  Yes.  There can be -- there can be

18  protective orders and safeguards put in place so that any

19  personal information would not be divulged.

20      I mean, the fact that he took it from Intel and put it

21  in his computer is his problem.  So now you go, you have to

22  trace it to where it is.

23      MR. SAKAGUCHI:  He did not --

24      THE COURT:  He will not divulge that, and he will not

25  divulge what he has received on that thumb drive in his

1    declarations.

2           I mean, he is -- his silence is deafening in his

3    declaration.  It is deafening as to what he doesn't say.  And

4    if you think about what it is that he should say, I don't

5    understand.

6           I'm sorry to keep interrupting, Counsel.  I just --

7    I'll be honest with you, your client frustrates me, incredibly

8    frustrates me.  And I don't know how he is going to look in

9    front of a jury, if that's where it goes.

10          MR. SAKAGUCHI:  Understood, Your Honor.

11          THE COURT:  Because it's -- you would have to be a

12   completely ignorant person to do what he did, and he's not.  He

13   is a member of this industry.

14          And to come up with this, I want to send good-bye

15   emails, it's just... But still, I'm trying to figure out what

16   is the standard -- I know what the standard is, but what is it

17   that would give Intel the right to have an injunction?

18          MR. SAKAGUCHI:  Let me address that, if you will?

19          THE COURT:  Go to the injunction, because the other

20   part I'm just going to say right now, from the limited

21   knowledge that I have about this case, without the discovery,

22   et cetera, I think your client is in a world of hurt.

23          MR. SAKAGUCHI:  So in Mr. Rivers' sworn declaration he

24   stated that he never put those spreadsheets on his computer.

25   He did use his computer to delete them from the thumb drive

1    because that is -- you need a computer to do that.

2              THE COURT:  Why?

3              MR. SAKAGUCHI:  Why did he delete them?

4              THE COURT:  Especially if he had notice to give it

5    back.

6              Why?

7              MR. SAKAGUCHI:  Unknown, Your Honor.

8              THE COURT:  Okay.  So Intel says:  You took this

9    information, give it back.  And so he puts it in his computer,

10   personal computer and then deletes it.

11             Why?

12             And then doesn't say anything.

13             Why?

14             MR. SAKAGUCHI:  He had no need for it.  He does have

15   no need for it.  He says this in his -- in his declaration,

16   sworn under oath.  He doesn't possess it.

17             We have done searches on his computer for the hash

18   values that --

19             THE COURT:  Why don't you let Intel do a forensic

20   search?

21             MR. SAKAGUCHI:  I'm sorry?

22             THE COURT:  Why don't you let Intel do a forensic

23   search?

24             MR. SAKAGUCHI:  We haven't crossed that bridge.

25             THE COURT:  I'm saying it right now.  Do you want to

1    have an injunction?

2            MR. SAKAGUCHI:  We don't want an injunction.

3            THE COURT:  Okay.  Then why haven't you talked to

4    Intel about voluntarily doing a forensic search with protective

5    orders.  Because I'm going to tell you right now, I don't know

6    where I can do this or how it is going to happen, but you are

7    not looking good right now.

8            MR. SAKAGUCHI:  Understood, Your Honor.

9            THE COURT:  So it seems to me that the way around

10   this, for both parties, would be to figure out how to get this

11   information as quickly and as easily as possible without this

12   court having to be the one to order you to do it.

13           MR. SAKAGUCHI:  Okay.  We can work on that, Your

14   Honor.

15           THE COURT:  Then go talk to your client -- to opposing

16   counsel.  You've got ten minutes.  Talk and figure out

17   something.  Because it is not looking good, I'll tell you that.

18           We'll be in recess for ten minutes.

19       (Off the record at 11:37 a.m.)

20       (Back on the record at 11:57 a.m.)

21           THE CLERK:  Please, remain seated.  Come to order.

22   Court is again in session.

23           THE COURT:  Where are we, Counsel?

24           MS. LUEDTKE:  So Your Honor, counsel for Mr. Rivers

25   has agreed that Mr. Rivers will make his home computer

1   available for inspection by our forensics firm, Stroz

2   Friedberg, and to allow the following things to be part of the

3   analysis:

4          Stroz Friedberg will do a search for the hash values,

5   which are unique document identifiers that we attached to our

6   various papers to them.

7          They will also do a search for search terms that would

8   be related to Intel documents.

9          They will report to counsel on the results of their

10  searches, and they will do those searches under the protective

11  order.  And the results of the searches will come out as

12  Attorney's Eyes Only so that only in-house and outside counsel

13  can see them initially.

14         They will also do analysis of transfer activity, which

15  will be forensics analysis of what USB drives or other

16  removable storage devices have been connected to that computer,

17  that could have been used to transfer files elsewhere.

18         They will do analysis of any activity involving

19  Cloud-based storage accounts.  So checking to see if he put any

20  of the misappropriated documents up in the Cloud, like on a

21  Google Docs Account, for example.

22         They will do analysis of any deletion or destruction

23  activity done on the computer.  So they will look at what's

24  called the unallocated space to see what is in the area where

25  documents that are deleted go.

1          They will look for any evidence that wiping software

2     or other software used to destroy evidence has been used.

3          And they will also look for evidence of when the USB

4     file used on the Intel laptop was deleted.

5          Finally, they will look for any evidence of printers

6     being connected to the home computer.  And if there is activity

7     involving printers, Mr. Rivers will make available the printers

8     that have been connected to that computer.

9          Have I accurately summarized that?

10          MR. SAKAGUCHI:  You have, with the caveat that, Your

11     Honor, this offer of compromise is premised on Your Honor's

12     statements prior to the break that we work out a compromise.

13          It is our position that this is to avoid the issuance

14     of an injunction and should help determine that there are no

15     Intel documents resident or in Mr. Rivers' possession, custody

16     and control.

17          THE COURT:  Well, you are correct, Counsel, but your

18     client could have alleviated a lot of this at the very early

19     stages by simply agreeing to this at the outset.

20          So you can say that it is because of the court's

21     comments, and it is, but -- I will take full responsibility for

22     what I have said, and I stand by what I have said, but it is

23     your client's situation.  He should have been the one to take

24     care of this.

25          Again, to make this court or try to have this court

1    try to think of things and deal with them, with the way your

2    client sets them forth is just, frankly, and at this point in

3    time I don't have all the discovery, but it is ridiculous.

4          So this is a reasonable resolution I would say at this

5    point in time, and I am assuming that your client will be

6    cooperative in every way.

7          I want a time period.

8          MS. LUEDTKE:  Your Honor, if I might interject?

9          We still strongly believe that a preliminary

10   injunction is needed.  Right now we don't know what's on this

11   computer.  And I, frankly, don't trust this defendant to not be

12   using it.

13         Your Honor had expressed concern in your questions to

14   me about how you can know that there is enough evidence here

15   for an injunction, and I would direct Your Honor to your own

16   decision in the Farmers case, which we cited in our papers.

17         That was a very good case to outline the test here

18   which is likelihood of success, irreparable harm, balancing of

19   equities and the public interest.  And here all of those

20   support an injunction.

21         It may be that Your Honor will later decide an

22   injunction can be lifted once they've cooperated fully and

23   we're comfortable.

24         THE COURT:  I think what you are looking at is a

25   temporary restraining order at this point in time with a

1    preliminary injunction to follow, if necessary.

2            MS. LUEDTKE:  That would be fine, Your Honor.

3            What we would like -- we do not have comfort in

4    Mr. Rivers' word at this point.  The time for that has passed.

5            What we would like is something with the authority of

6    the court that makes him take this seriously and says that he

7    should not be using, disclosing or retaining any documents that

8    came from Intel's computers that are proprietary and relate to

9    3D XPoint and Optane and an order that he needs to cooperate

10   and return anything that we find.

11           And I agree we should set a deadline for this

12   inspection.  Our folks are ready to go promptly.

13           THE COURT:  How long will that take?

14           MS. LUEDTKE:  Getting possession of it should be able

15   to be done tomorrow.  And then once they have possession of the

16   home computer, I believe -- I would guess it will take them a

17   week to run the searches and get the results.

18           THE COURT:  So 14 days would be sufficient?

19           MS. LUEDTKE:  I would like to get possession of it

20   tomorrow, if possible.  Yes, 14 days to complete the analysis.

21   And we can then work together --

22           THE COURT:  The reason I'm saying 14 days is for a

23   temporary restraining order.

24           MS. LUEDTKE:  Got it.  Yes.

25           THE COURT:  And so I'm going to issue a temporary

 1    restraining order as requested at this point in time with the

 2    addition of the requirements that you've lined out.

 3          Counsel, can you provide the court with a written copy

 4    of what you are saying?

 5          MS. LUEDTKE:  Yes, Your Honor.  I would be happy to do

 6    that.

 7          THE COURT:  Do that as soon as possible.

 8          And the order that will come from the court will be

 9    the order that will be controlling, notwithstanding anything

10    that's been said orally during the hearing today.

11          But I want to make sure that there will be no further

12    dissemination, erasure or copying, transferring, or any other

13    terminology that can be used in the technology field of any

14    information that was downloaded from the Intel computers and

15    could be -- I'm saying the words "could be" considered

16    proprietary by Intel.

17          Because right now all that I can tell you is that

18    there are at least 3,000 personnel documents, which there may

19    be 2,900 people who are wondering why their personal

20    information has been downloaded by an ex-employee.  I would

21    have that question.

22          And these Perl issues, we'll deal with that, but I

23    want this all to be done.  You'll have the information for the

24    proposed -- for the order that's going to come out.  Today is

25    Thursday.  I would like to have that by Monday.

1          MS. LUEDTKE:  Yes, Your Honor.

2          THE COURT:  All right.  And it will be 14 days.

3          And then on the 14th day from today, which will be the

4   21st, I'm going to have a written joint statement from both of

5   you stating that the computer has been turned over and that the

6   forensic examination has been completed and what the results

7   are.

8          Once the court has received that joint written

9   statement from you, the court will make a determination if, in

10  fact, a further preliminary injunction should issue, or if this

11  matter should be -- not the matter, but this request for an

12  injunction should continue or not.

13         But at this point in time this is simply temporary,

14  and the court is trying to maintain the status quo at this

15  point in time until this situation can be handled.

16         I do appreciate counsel that you both worked together

17  to make up a program that can be utilized to get what needs to

18  be done because, to be quite frank with you, it was going to

19  issue today, and I was going to make sure that this happened,

20  one way or the other.

21         I'm sure that I probably wouldn't get every technical

22  detail right, but I think that by doing this you'll make sure

23  each of you have comfort in the way it is going to be handled.

24         All right.  Any questions about the court's order at

25  this time?

1              MS. LUEDTKE:  No.  Thank you, Your Honor.

2              THE COURT:  Any questions?

3              MR. SAKAGUCHI:  No.  Thank you, Your Honor.

4              THE COURT:  Thank you.  That's it.

5              So we can get the proposed order on Monday.

6              MS. LUEDTKE:  Yes.  Thank you, Your Honor.

7              THE COURT:  There are no other matters on calendar.

8    Court is adjourned.

9         (Off the record at 12:06 p.m.)

10                            ---o0o---

11

12

13

14                      *REPORTER'S CERTIFICATE*

15                            *---o0o---*

16

17    *STATE OF CALIFORNIA  )*
      *COUNTY OF SACRAMENTO )*

18         *I certify that the foregoing is a correct transcript*
      *from the record of proceedings in the above-entitled matter.*
19

20         *IN WITNESS WHEREOF, I subscribe this certificate at Sacramento,*
      *California.*

21    */S/ Catherine E.F. Bodene_____*
           *CATHERINE E.F. BODENE, CSR NO. 6926*
22         *Official United States District Court Reporter*

23

24

25