1  GREGORY P. STONE (State Bar No. 78329)
   Gregory.Stone@mto.com
2  JEREMY K. BEECHER (State Bar No. 301272)
   Jeremy.Beecher@mto.com
3  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue, Fiftieth Floor
4  Los Angeles, California 90071-3426
   Telephone:    (213) 683-9100
5  Facsimile:    (213) 687-3702

6  CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
   Carolyn.Luedtke@mto.com
7  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, Twenty-Seventh Floor
8  San Francisco, California 94105
   Telephone:    (415) 512-4000
9  Facsimile:    (415) 512-4077

10  Attorneys for Plaintiff Intel Corporation

11

12              UNITED STATES DISTRICT COURT

13            EASTERN DISTRICT OF CALIFORNIA

14                 SACRAMENTO DIVISION

15

16  INTEL CORPORATION,                    Case No. 2:18-cv-03061-MCE-AC

17              Plaintiff,                **FIRST AMENDED COMPLAINT FOR:**

18       vs.                             **(1) VIOLATION OF THE DEFEND
                                         TRADE SECRETS ACT, 18 U.S.C. § 1836**
19  DOYLE RIVERS, an individual, and DOES 1   ***ET SEQ.*; AND**
    through 10, inclusive,
20                                        **(2) BREACH OF CONTRACT
              Defendants.                (CONFIDENTIALITY AGREEMENT)**
21
                                         **DEMAND FOR JURY TRIAL**
22
                                         Judge:    Hon. Morrison C. England, Jr.
23

24

25

26

27

28

Plaintiff Intel Corporation ("Intel") alleges against Defendants Doyle Rivers ("Rivers") and Does 1 through 10 as follows:

**SUMMARY OF ACTION**

1.      Rivers is a computer hardware engineer who was involved in Intel's development of 3D XPoint, a revolutionary new type of memory technology in which Intel has invested over a billion dollars.  Intel has developed 3D XPoint in conjunction with a joint venture partner, Micron Corporation ("Micron").  The joint venture is coming to an end, and Intel and Micron are building their own independent teams to compete in the 3D XPoint marketplace.

2.      Rivers also played a role in Intel's independent development of products utilizing 3D XPoint technology resulting in the production of Intel proprietary systems like Intel's Optane™ branded solid state drives ("SSDs") that Intel sells to customers.  In this systems development role, Rivers had access to Intel's highly confidential, trade secret information that Intel did not share with the public or with any other entity unless pursuant to a confidentiality agreement.

3.      In September 2018, Rivers secretly accepted an engineering position with Micron and then, as he prepared to leave Intel for that job, engaged in a covert and calculated effort to collect Intel's confidential, proprietary, and trade secret technical and personnel information.  A few days before he left Intel, Rivers tried to access and copy a "top secret" designated Intel file that Intel's electronic security system blocked from being copied.  The "top secret" Intel file that Rivers attempted to download related to Intel's independent, highly confidential work to productize 3D XPoint into its Optane™ line of products and was not something that was shared with anyone outside Intel, including anyone at Micron.  The night before he left, Rivers plugged a USB storage device into his Intel computer for more than an hour, from 10:40 p.m. until 11:40 p.m.  During that time, Rivers accessed a highly sensitive compilation of Intel personnel information and copied that information to the USB device.  At the same time, Intel is informed and believes and therefore alleges that Rivers copied additional confidential Intel files to the USB device.

4.     As he was leaving and after he left Intel, Rivers has recruited Intel personnel using Intel trade secret and/or confidential information—including, but not limited to, his knowledge of employee technical capabilities, performance review history, and compensation information—all in violation of his confidentiality agreement not to retain or use such trade secret and/or confidential Intel information after leaving Intel and in violation of federal trade secret law.  In doing so, he has given himself and his new employer an unfair and unlawful competitive advantage in the marketplace.

5.     Demonstrating he was well aware of the wrongful nature of his actions, Rivers attempted to hide his misconduct.  As soon as Intel detected his downloading of files, it sent a letter to him demanding that he not destroy any evidence and that he return the USB device immediately.  Rivers never responded to Intel, nor did he return the device.  Instead, he handed the USB device over to his new employer.  When the USB device was finally turned over to a forensic investigator, Intel found out that the USB device had been wiped of all information downloaded by Rivers.  Shortly after Intel learned about the destruction of evidence on the USB device, Intel was informed that Rivers would no longer be represented by counsel for his new employer but rather by his own personal counsel.

6.     When Intel demanded an explanation from Rivers' counsel about the destruction of evidence on the USB device, Rivers' counsel confirmed that Rivers downloaded the compilation of personnel information and other documents from his Intel laptop to his USB device, uploaded some of that information to his home computer, and used his home computer to wipe the USB device.  In response, Intel made the reasonable request that Rivers agree to have a neutral forensic investigator inspect the home computer to remove any existing Intel confidential information from the device, confirm that Intel's information had not been further downloaded or shared, and confirm when Rivers destroyed the contents of the USB device.  Intel gave Rivers a deadline of November 16 to agree to that inspection.  Rivers refused.  Intel brought this action shortly thereafter.

7.     Following the hearing on Intel's Motion for Preliminary Injunction in February 2019, Rivers stipulated to the entry of a Temporary Restraining Order which included the

-3-
FIRST AMENDED COMPLAINT

1   inspection of his home computer by a third-party forensic investigation firm.  That inspection

2   revealed that, before turning his home computer over for inspection, Rivers employed a suite of

3   anti-forensic applications on his home computer and USB device designed to permanently delete

4   and encrypt data and to conceal internet activity, and conducted mass file deletion on his home

5   computer hard drive, leading the forensic inspector unable to determine what files existed in those

6   locations previously due to Rivers' use of the six anti-forensic applications.  The inspection further

7   revealed that Rivers connected 14 removable storage devices to his home computer between the

8   time he misappropriated Intel's trade secrets and confidential information and the time he turned

9   over his home computer to the forensic inspector for examination.

10       8.      Furthermore, Rivers admitted in sworn discovery responses in this matter that he

11   downloaded trade secret and confidential files containing (1) confidential information regarding

12   thousands of Intel employees, (2) salary and bonus information for 31 Intel Non-volatile Memory

13   Solution Group employees – including employees Intel believes Rivers recruited to and hired at

14   his new employer and (3) a highly sensitive, proprietary tool containing data pertaining to Intel

15   SSD products that are still under development and have not yet been released – the same products

16   Rivers was hired by Intel's competitor to develop.

17       9.      Rivers has also admitted in sworn discovery responses that he personally recruited

18   Intel personnel with whom he worked to join his team at Micron.  Intel is informed and believes

19   and therefore alleges that Rivers recruited these Intel personnel using Intel trade secret and/or

20   confidential information—including, but not limited to, the confidential documents he

21   downloaded (and tried to cover up), his knowledge of employee technical capabilities,

22   performance review history, and compensation information—all in violation of his agreements not

23   to retain or use such trade secret and/or confidential Intel information after leaving Intel.  In doing

24   so, he gave himself and his new employer an unfair and unlawful competitive advantage in the

25   marketplace.

26       10.      Intel brings this action to protect its trade secrets and confidential information and

27   prevent further improper solicitation of its employees using that information.

28

FIRST AMENDED COMPLAINT

**PARTIES**

11.     Plaintiff Intel Corporation is a Delaware corporation with its principal place of business in Santa Clara County, California.

12.     Defendant Doyle Rivers is an individual residing in El Dorado County, California.

13.     Plaintiff is informed and believes, and on that basis alleges, that each of the Defendants sued herein as Does 1 through 10, inclusive, is in some way legally responsible and liable to Plaintiff with respect to the matters set forth herein.

**SUBJECT MATTER JURISDICTION, VENUE AND DIVISION**

14.     This Court has subject matter jurisdiction over Intel's federal trade secret claim pursuant to 18 U.S.C. § 1836 *et seq.* and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

15.     Rivers is the sole named Defendant and resides in this judicial district.  In addition, a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this Judicial District.  Venue therefore lies in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

16.     A substantial part of the events giving rise to the claims alleged in this Complaint occurred in the Counties of El Dorado and Sacramento.  Accordingly, this action is properly filed in the Sacramento Division of this Court pursuant to Local Rule 120(d).

**FACTUAL ALLEGATIONS**

**Rivers' Work at Intel**

17.     Rivers worked at Intel's research and development campus in Folsom, California, from 2010 to 2018.

18.     Rivers served as an engineering manager with Intel.  During his years at Intel, Rivers worked on Intel's development of a revolutionary new type of memory technology called 3D XPoint in which Intel has invested over a billion dollars.  Most recently, he worked on Intel's systems development for integrating 3D XPoint into Optane™ SSD products.

19.     In his work for Intel, Rivers had access to highly sensitive and confidential Intel information about the development of 3D XPoint and about the development and sale of Intel's Optane™ products that use and work with the groundbreaking memory technology.

**Rivers Agrees To Protect Intel Confidential Information**

20.     When Rivers began working at Intel in October 2010, he signed an Employment Agreement.

21.     In the Employment Agreement, Rivers promised to "hold in strict confidence and not disclose or use any Confidential Information connected with Intel business or . . . any of Intel's . . . employees."  The Employment Agreement defines "Confidential Information" as including,

> without limitation: technical information (e.g. roadmaps, schematics, source code, specifications), business information (e.g. product information, marketing strategies, markets, sales, customers, customer lists or phone books), personnel information (e.g. organizational charts, employee lists, skill sets, names or phone numbers, personnel files, employee compensation) and other non-public Intel data and information of a similar nature.

22.     In the Employment Agreement, Rivers promised to "return to Intel all of its Confidential Information . . . at the termination of my Intel employment or upon Intel's request."

23.     In the Employment Agreement, Rivers agreed that any breach of the Employment Agreement would cause irreparable harm to Intel and entitle Intel to injunctive relief.

**Rivers Leaves Intel in September 2018**

24.     On September 10, 2018, Rivers gave notice that he would end his employment with Intel that same day.

25.     Intel is informed and believes and therefore alleges that shortly after leaving Intel, Rivers began working at Micron as Vice President of 3D XPoint Engineering.

**Rivers Agrees Not to Disclose Intel's Trade Secrets and
Signs Intel's Trade Secret Acknowledgment Form**

26.     On September 10, 2018—his last day of work at Intel—Rivers participated in an exit interview with Intel's Darron Flagg and David Dixon.

27.     During the exit interview, Flagg and Dixon reminded Rivers that he was obligated to keep Intel confidential information and trade secrets confidential and that he not disclose or retain Intel confidential or trade secret information.

28.     That same day, Rivers acknowledged these obligations when he signed a Trade Secret Acknowledgment Form ("TSAF").

29.     In the TSAF, Rivers represented that he had "acquired knowledge or had access to trade secrets and confidential or other proprietary information of Intel Corporation," and he identified the following categories of trade secrets and confidential and proprietary information to which he had access at Intel:

       i.     Financial and pricing information for Intel's Optane™ product;

      ii.     Customer specific pricing strategies for Optane™;

     iii.     Intel's business and new product plans, objectives, and strategies for Optane™;

     iv.     Customer and vendor lists, contacts, habits, and plans for Optane™, including customers targets and vendors;

      v.     Marketing information concerning Optane™ and strategy reviews from an engineering perspective;

     vi.     Yields, designs, efficiencies, and capabilities of production methods, facilities and systems for 3D XPoint and Optane™ (solid state drive solutions);

    vii.     Patent applications related to 3D XPoint and Optane™;

   viii.     Product designs and specifications, such as Test Tapes, Schematics, Database Tapes, or other, for the following Intel products: Optane™ (solid state drives), 3D XPoint component test tapes and schematics; and

     ix.     Business group information, including personnel lists, organizational structure, identities, skills, experience, WWIDs, compensation and location of Intel personnel.

30.     In the TSAF, Rivers agreed that he would not "use for [his] own benefit or the benefit of others any Intel Confidential Information without the prior written permission of Intel . . . ."

31.     Furthermore, in the TSAF, Rivers confirmed that he had

    returned to Intel all Intel Confidential Information, including all confidential reports, drawings, documents, process specifications,

1
2
3
4

> masks, product specifications, manuals, field manuals, diagnostic
> tools, software diagnostics, virus routines, network analysis, spare
> parts lists, customer lists, customer contact names, contracts and
> agreements, all computer files, data and software packages to which
> I have had access during my past employment and which are the
> property of Intel, its subsidiaries, customers or third parties.

32.     In the TSAF, Rivers also represented: "I also confirm that I have no such

documents or full or partial copies thereof or any other Intel property or material in my possession

or my custody anywhere."

### Rivers Downloads Confidential and Trade Secret Intel Information before Departing Intel and Attempts to Conceal the Evidence

33.     A few days before his departure, Rivers attempted to download a file classified as

Intel Top Secret, but Intel's automated Data Loss Prevention program blocked the download due

to the file's classification as Intel Top Secret.  This file was a confidential Intel document related

to Intel's implementation of 3D XPoint technology and work developing products utilizing 3D

XPoint.  It was not a document Intel shared outside of Intel.

34.     After Rivers' departure, Intel conducted a forensic examination of Rivers' Intel-

issued laptop.

35.     The forensic examination revealed that at 10:40 p.m. on September 9, 2018—the

night before he left his employment with Intel and before he gave notice—Rivers plugged a USB

device into his Intel-issued laptop.  He had the USB device plugged into his Intel laptop for at

least an hour.

36.     At 11:40 p.m., Rivers downloaded to the USB device a highly confidential, trade

secret Intel file, "OrgTreeFlat_List.xlsx," that contained a confidential compilation of personnel

information (including but not limited to, full names, title, email, location, phone, cell (personal

and/or work provided), hire/start date and length of service) for over 3,000 Intel employees,

including those working on Intel's 3D XPoint development.

37.     That same night, Rivers downloaded the contents of a folder named "Old_Scripts,"

containing 110 Perl Scripts, to his USB device.

38.     Based on Rivers' activity using the USB device for at least an hour on the night of

September 9, 2018, Intel is informed and believes and therefore alleges that Rivers likely

downloaded additional confidential and/or trade secret Intel files he had access to as part of his position working on 3D XPoint and Optane™ development.

39.     Following the discovery that Rivers downloaded confidential Intel files to a USB device, Intel's in-house counsel contacted Rivers on October 2, 2018 by email.  Intel's in-house counsel sought Rivers' cooperation in returning the downloaded files and instructed Rivers not to "destroy or delete any Intel material on the USB device" or that had been transferred from the USB device.  Intel's in-house counsel further requested that Rivers "immediately provide access to Intel of the devices and/or accounts used to download Intel information."

40.     Rivers never responded to Intel's October 2, 2018 email.

41.     Instead, counsel for Rivers' new employer responded and explained that all communications should go through the new employer's counsel.

42.     Rivers' new employer subsequently informed Intel that it had taken possession of the USB drive and given that device to its outside counsel, who in turn informed Intel that a company called Lighthouse had taken possession of the device.

43.     Intel never gave Rivers permission to disclose the USB drive or its contents to his new employer.  Indeed, Intel's October 2 letter to Rivers clearly instructed Rivers to return the drive *to Intel* immediately.

44.     Intel never gave Rivers' new employer permission to give the USB device or its contents to outside counsel or Lighthouse.

45.     Intel demanded that Rivers, his new employer, outside counsel, and Lighthouse return the USB drive onto which Intel's confidential files were downloaded.  Ultimately, the USB was provided to an agreed-upon third-party forensic investigation firm, Stroz Friedberg, for examination.

46.     The USB device was transported from Lighthouse to Stroz Friedberg on October 19, 2018.

47.     After analyzing the USB device, Stroz Friedberg determined that its contents had been deleted.  Stroz Friedberg's examination revealed that none of the content downloaded by Rivers on his last day at Intel remained on the device.  Specifically, the "OrgTreeFlat_List.xlsx"

file with the confidential, trade secret compilation of personnel information and the files from the "Old_Scripts" folder had been deleted from the USB drive by the time Stroz Friedberg analyzed it. Because the device was wiped, Stroz Friedberg was unable to determine when this deletion occurred or what other files had been uploaded to the device and then deleted.

48.     Evidence on Rivers' Intel-issued laptop, however, shows that the files were not deleted from the USB device while it was connected to the Intel laptop on the night of September 9, and that the USB device was not connected to Rivers' Intel-issued laptop at any time after September 9.

49.     Intel is informed and believes and therefore alleges that Rivers deleted the contents of the USB drive between the time of his late-night downloading of Intel's trade secrets and/or confidential information on September 9, 2018, and when his new employer gave the USB device to Stroz Friedberg on October 19, 2018.

50.     Stroz Friedberg informed Micron's outside counsel that the files on the USB drive had been deleted.  Micron's counsel subsequently informed Intel's counsel that Rivers would thereafter be represented by separate personal counsel.

51.     Intel communicated with Rivers' separate counsel and demanded an answer as to (a) what files he downloaded from Intel, (b) what he did with those files, and (c) when and why the files on the USB device were deleted.

52.     Rivers' counsel confirmed to Intel that Rivers had downloaded the spreadsheet with contact information for Intel employees and "script" files from his Intel computer to the USB just before leaving Intel and that he took that USB device with those files out of Intel upon the conclusion of his employment.

53.     Rivers' counsel informed Intel that Rivers had plugged the USB device into his home computer and uploaded at least some of the files that Rivers had downloaded from his Intel computer.  Rivers' counsel said that those files remained on his home computer.

54.     Rivers' counsel informed Intel that Rivers then deleted the downloaded files from the USB device while it was connected to his home computer.  Rivers' counsel would not explain when or why Rivers deleted the files from the device.

FIRST AMENDED COMPLAINT

55.    Intel offered to work with Rivers and his counsel cooperatively to identify and remove all Intel files from his home computer.  Intel demanded the opportunity to inspect Rivers' home computer using the same neutral forensic firm, Stroz Friedberg, to identify any Intel files uploaded from the USB device to the computer and to determine any information about the deletion of the USB device from that computer.  Intel offered to agree to a protocol that would protect his personal information from being revealed to Intel.  Rivers refused.  Intel offered to pay for the cost of Stroz Friedberg's work.  Rivers still refused.  Intel made the request for cooperation again and gave Rivers a deadline of Friday November 16, 2018 to allow Stroz Friedberg to conduct the inspection.  Rivers still refused.

56.    Intel therefore was forced to bring this action shortly thereafter to protect its trade secrets and confidential information and prevent further improper solicitation of its employees using that confidential and trade secret information.

**Discovery in This Action Reveals the Extent of Rivers' Wrongdoing**

57.    Discovery in this action has confirmed that Intel's concerns regarding Rivers' misappropriation of its trade secrets and confidential information were well founded.

58.    With the Court's encouragement at the February 7, 2019 hearing, Rivers' counsel agreed to allow the forensic inspection of Rivers' home computer that Intel had unsuccessfully sought up until that time.

59.    The evidence uncovered by Stroz Friedberg during that inspection revealed that Rivers took great measures to destroy evidence to cover his tracks after downloading confidential and trade secret Intel information, and that he then misrepresented his actions in the briefs and declarations filed with this Court.

60.    Specifically, Stroz Friedberg determined that Rivers had employed *six* different anti-forensic applications on his home computer and USB device designed to permanently delete and encrypt data and to conceal internet activity.  These anti-forensic applications were not part of a pattern of activity for Rivers over time.  Instead, they appear to be tools that he employed in the wake of his departure from Intel and with increased frequency after Intel raised concerns with him about his taking confidential and trade secret information.

61.     Stroz Friedberg further determined that Rivers conducted mass file deletion on his home computer hard drive prior to the forensic inspection, leading Stroz Friedberg to be unable to determine what files existed in those locations previously because of the various anti-forensic tools Rivers employed.

62.     Stroz Friedberg further determined that Rivers connected 14 removable storage devices to his home computer between the time he misappropriated Intel's trade secrets and confidential information and the time he turned over his home computer to the forensic inspector for examination.

63.     Stroz Friedberg further determined that Rivers had downloaded to his home computer an executable application called "TOR Browser."  The main purpose of the "TOR Browser" application is to hide the IP address of the user's computer, as well as to hide the search history of the user.

64.     Rivers has admitted in sworn discovery responses in this action that he downloaded trade secret and confidential files containing (1) confidential information regarding *thousands* of Intel employees, (2) *salary and bonus* information for 31 Intel Non-volatile Memory Solution Group employees – including employees Intel believes Rivers recruited to and hired at his new employer and (3) a highly sensitive, proprietary tool containing data pertaining to Intel SSD products that are still under development and have not yet been released – the same products Rivers was hired by Intel's marketplace competitor to develop.  Stroz Friedberg could not locate these files on Rivers' home computer hard drive during its inspection.

65.     Rivers has further admitted in sworn verified discovery responses in this action that he deleted these files from the removable storage device he used to misappropriate them *after* Intel warned him not to delete any such files and instead to return the removable storage device to Intel immediately (which he did not do).

## Rivers Solicits Intel Employees to Depart Intel for Micron Using Intel's Trade Secret and Confidential Information

66.     Rivers has confirmed that Intel's suspicions regarding a core purpose of Rivers' misappropriation – to utilize his inside knowledge of Intel employees' compensation and

performance to poach them on behalf of his new employer, Intel's direct competitor – were accurate.

67.     Specifically, Rivers admitted in sworn discovery responses that he solicited a number of Intel employees – including those whose compensation and bonus information he misappropriated – to work on his new team at Intel's direct marketplace competitor, Micron.

68.     Intel is informed and believes and therefore alleges that Rivers solicited Intel employees to join him at Micron in part using Intel confidential and/or trade secret information, including his knowledge of the employees' technical capabilities, performance review history, and compensation information.

69.     At least some of the Intel employees that Rivers solicited left Intel and joined Micron.

**FIRST CAUSE OF ACTION**

**(Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.)**

70.     Intel alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 68 above.

71.     Rivers violated the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, by misappropriating the following Intel Trade Secrets: (a) technical information regarding 3D XPoint design and manufacturing, including Intel's Optane™ products and Intel's internal, non-public information related to Intel's work developing and expanding Intel's product base for 3D XPoint; (b) a compilation of Intel personnel information with the file name "OrgTreeFlat_List.xlsx" that contains employee information for more than 3,000 Intel employees (including but not limited to, full names, title, email, location, phone, cell (personal and/or work provided), hire/start date and length of service); and (c) information pertaining to Intel employees' technical capabilities, performance review history, and compensation information.

72.     The Intel Trade Secrets relate to technology products used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

73.     The Intel Trade Secrets are not generally known to the public or generally known in the industry, and their value is derived from the fact that they are kept secret.

74.     Some of the Intel Trade Secrets are a compilation of information that standing alone might not be a trade secret, but in the aggregate, constitute a protectable trade secret.

75.     Intel spent considerable time and energy compiling the Intel Trade Secrets.  Only a few hundred people in the world have specialized knowledge pertaining to 3D XPoint, and the processes for developing and manufacturing 3D XPoint are not written in any textbook or taught in any school.  Intel is informed and believes and therefore alleges that having access to the Intel Trade Secrets—including a list containing the few hundred individuals in the world qualified to work on 3D XPoint—gave Rivers and his new employer an unfair advantage in their effort to compete with Intel in the marketplace and could allow Rivers and his new employer to develop and productize 3D XPoint more quickly than would have been possible had they started from scratch.

76.     The Intel Trade Secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.  These efforts include, but are not limited to: (a) password protection to access Intel's systems containing the Intel Trade Secrets; (b) requiring incoming employees to sign the Employee Agreement, in which they promise to hold in strict confidence, and not disclose or use, any Intel trade secrets outside of their employment with Intel; (c) requiring outgoing employees to sign the Trade Secret Acknowledgment Form, in which they acknowledge their receipt of trade secret information during their employment with Intel and promise they do not retain any trade secret information and will not use it after the cessation of their employment; and (d) conducting an exit interview for departing employees at which the departing employee is reminded of his or her confidentiality obligations.

77.     Rivers was under a duty to keep the Intel Trade Secrets confidential and to not disclose this information other than for the benefit of Intel.

78.     Rivers accessed the Intel Trade Secrets after he accepted a job with Micron and as he was secretly preparing to leave Intel.  Rivers downloaded the Intel Trade Secrets onto a USB device that he took with him when he left Intel.  This action was contrary to the representation Rivers made in his TSAF where he promised that he was not taking any such material.

79.     Intel is informed and believes and therefore alleges that Rivers, without Intel's permission, uploaded the Intel Trade Secrets to his home computer.

80.     Rivers provided the USB device containing the Intel Trade Secrets to Micron without permission from Intel.

81.     Intel is further informed and believes that Rivers has used and will use the Intel Trade Secrets in his work outside Intel in violation of his duty to Intel to keep that information confidential.

82.     Rivers' wrongful conduct in misappropriating the Intel Trade Secrets has caused and will cause Intel great and irreparable harm.  Intel has no adequate remedy at law for the harm being suffered.

83.     As a direct and proximate result of Rivers' conduct, Intel has suffered damages in an amount to be determined at trial.

84.     Rivers willfully and maliciously misappropriated the Intel Trade Secrets, with the deliberate attempt to injure Intel's business and improve his new employer's business, thereby entitling Intel to an award of exemplary damages and/or attorneys' fees.

## SECOND CAUSE OF ACTION

### (Breach of Contract – Confidentiality Agreement)

85.     Intel alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 68 above.

86.     Intel and Rivers entered into a valid and enforceable contract, the Employment Agreement.

87.     In the Employment Agreement, Rivers agreed that, upon the termination of his employment with Intel, he would "hold in strict confidence and not disclose or use any Confidential Information connected with Intel business or the business of any of Intel's . . . employees," and it defined Confidential Information as including,

> without limitation: technical information (e.g. roadmaps, schematics, source code, specifications), business information (e.g. product information, marketing strategies, markets, sales, customers, customer lists or phone books), personnel information (e.g. organizational charts, employee lists, skill sets, names or phone

numbers, personnel files, employee compensation) and other non-public Intel data and information of a similar nature.

88.     Rivers further agreed to "return to Intel all of its Confidential Information . . . at the termination of my Intel employment or upon Intel's request."

89.     Intel did all, or substantially all, of the significant things that the Employment Agreement required it to do.

90.     Rivers breached the foregoing provisions of the Employment Agreement by recruiting Intel employees to work for his new employer.  Intel is informed and believes and therefore alleges that Rivers did so in part by using confidential information he had acquired pertaining to those employees' contact information, skill sets and technical capabilities, performance review history, and compensation information.

91.     Rivers further breached the foregoing provisions of the Employment Agreement by downloading confidential compilations of Intel employee information and taking that information outside of Intel after his employment ended.

92.     Rivers further breached the foregoing provisions of the Employment Agreement by downloading confidential files related to 3D XPoint and taking those outside of Intel after his employment ended.

93.     Rivers failed to return Intel Confidential Information to Intel at the end of his employment despite his obligation to do so and despite Intel's request.

94.     When asked whether he was returning all Intel Confidential Information, Rivers made a false statement in his TSAF and wrongly confirmed that he was not retaining any Intel Confidential Information.

95.     Rivers' breaches have directly, substantially and irreparably harmed Intel.

96.     Intel has no adequate remedy at law for Rivers' breach of his Employment Agreement.  Unless restrained, Rivers' use of confidential Intel information will cause Intel serious and irreparable harm, both during the pendency of this action and thereafter.

97.     As a direct and proximate result of Rivers' conduct, Intel has suffered damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Intel prays for judgment against Rivers as follows:

(1)    For a preliminary and a permanent injunction enjoining Rivers from the following:

    (a)    Obtaining, accessing, using, retaining, transmitting, copying, or disclosing any of Intel's confidential, proprietary, or trade secret information, including but not limited to technical information regarding 3D XPoint design and manufacturing and personnel information relating to Intel's organizational structure, employee personal information (including but not limited to, full names, title, email, location, phone, cell (personal and/or work provided), hire/start date and length of service), and Intel employees' technical capabilities, performance review history, and compensation information.

    (b)    Deleting, destroying, altering, or erasing any evidence related to this action, including but not limited to any hard or electronic copies of any information, documents, or data Rivers copied, accessed, or took from Intel; and

    (c)    Using confidential or trade secret Intel information to directly solicit any Intel employee to leave his or her employment with Intel and join him at his new employer until September 10, 2019;

(2)    For an order directing Rivers to return to Intel all Intel confidential, proprietary, or trade secret information, documents, or data;

(3)    For compensatory damages, lost profits, unjust enrichment, and restitution in an amount to be shown at trial;

(4)    For exemplary damages of twice the amount awarded as general damages for the first cause of action for misappropriation of trade secrets;

(5)    For Intel's attorneys' fees;

(6)    For pre- and post-judgment interest and costs of suit incurred herein; and

(7)    For any other and further relief that the Court may deem just and proper.

FIRST AMENDED COMPLAINT

DATED:  June 10, 2019                          MUNGER, TOLLES & OLSON LLP


                                        By:  _____/s/ Carolyn Hoecker Luedtke_____
                                              CAROLYN HOECKER LUEDTKE
                                        Attorneys for Plaintiff Intel Corporation

**FIRST AMENDED COMPLAINT**

1

## **DEMAND FOR JURY TRIAL**

2

Intel hereby demands a jury trial for all claims for which a jury trial is available.

3

4

DATED:  June 10, 2019                         MUNGER, TOLLES & OLSON LLP

5

6

By: _____/s/ Carolyn Hoecker Luedtke_____

7

CAROLYN HOECKER LUEDTKE

Attorneys for Plaintiff Intel Corporation

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT